Kim Richman (*Pro Hac Vice*)
Jaimie Mak (State Bar No. 236505)
**RICHMAN LAW & POLICY**
535 Mission Street
San Francisco, CA 94105
Telephone: (415) 259-5688
krichman@richmanlawpolicy.com
jmak@richmanlawgroup.com

*Attorneys for Plaintiffs and Proposed Class*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KACHUCK ENTERPRISES, BANTLE AVOCADO FARM, MASKELL FAMILY TRUST D/B/A MASKELL GROWERS and NORTHERN CAPITAL, INC., and, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MISSION PRODUCE, INC., CALAVO GROWERS, INC., FRESH DEL MONTE PRODUCE, INC., DEL MONTE FRESH PRODUCE COMPANY, DEL MONTE FRESH PRODUCE N.A., INC.,<br><br>Defendants. | Case No. 2:25-cv-01523-AH-JC<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>CAL. BUS. & PROF. CODE SECTION 17200 *Et Seq.* |

Plaintiffs Kachuck Enterprises, Bantle Avocado Farm, Maskell Family Trust d/b/a Maskell Growers, and Northern Capital, Inc., (collectively, "Plaintiffs") all own and operate avocado orchards located in Southern California. Plaintiffs, individually and on behalf of other similarly situated businesses and individuals, by and through their counsel, hereby bring this action against Mission Produce, Inc. ("Mission"), Calavo Growers, Inc. ("Calavo"), and Fresh Del Monte Produce, Inc., Del Monte Fresh Produce Company, Del Monte Fresh Produce N.A.,

1
CLASS ACTION COMPLAINT

Inc. (collectively, "Del Monte"). Plaintiffs bring this action as horizontal competitors under California's Unfair Competition law ("UCL"), Cal. Bus. & Prof. Code § 17200, asserting a single unfair business practices claim governed expressly by *Cel-Tech Commc'ns, Inc, v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163 (Cal. 1999). Plaintiffs seek only forward-looking injunctive relief to restore fair competitive conditions in the avocado market.

Plaintiffs allege the following based upon information, belief, and the investigation of counsel:

## I.    BACKGROUND

1.    In the 1980s, the total supply of avocados in the United States was almost entirely covered by domestic production, and the majority of avocados sold to U.S. consumers were grown in California.[1]

2.    Since Avocados From Mexico (AFM), the marketing arm of Mexican Hass Avocado Importers Association (MHAIA), began aggressively supporting the business practices of sellers and businesses who profit from the sale of avocados sourced from Mexico through strategic marketing on their behalf, the popularity of avocados in the U.S. has soared.[2]

3.    The presence of avocados in United States supermarkets has tripled in the past twenty years, and avocados in the United States are now a $3-billion-per-year industry.[3]

---

[1] Malek A. Hammami, et. al., *An Overview of the Avocado Market in the United States*, Ask IFAS (Aug. 15, 2024), https://edis.ifas.ufl.edu/publication/FE1150.

[2] Avocados From Mexico, *Our Company*, https://avocadosfrommexico.com/about/brand/ (last visited Jan. 28, 2026).

[3] Jorge Vaquero Simancas, *Arson, logging and water theft: The avocado industry deforests Mexico*, EL PAÍS (Nov. 29, 2023, 10:07 AM), https://english.elpais.com/international/2023-11-29/arson-logging-and-water-theft-the-avocado-industry-deforests-mexico.html.

CLASS ACTION COMPLAINT

4.      Eight in ten avocados in the U.S. are exported from Mexico.[4]

5.      California avocado farmers are required to meet robust federal and state environmental requirements and to follow, *inter alia*, Good Agricultural Practices and the Food Safety Modernization Act.

6.      California avocado farmers, such as Plaintiffs, go beyond meeting the aforementioned robust environmental standards, and implement additional sustainability measures such as regenerative agriculture practices, water conservation measures and erosion control systems.

7.      As such, California avocados growers pay for the costs of environmental degradation, regenerative practices, and water conservation directly, i.e., California growers internalize those costs that, if ignored, would be borne by the public now and in the future.

8.      In contrast, Defendants all source their avocados from orchards in Mexico, where the local environment is being decimated by uncontrolled deforestation, severe water shortages, soil degradation, and biodiversity and habitat loss driven by U.S. demand for avocados.

9.      Due to the high consumer demand for both avocados and sustainably grown produce, one would expect California avocado growers, such as Plaintiffs, to be doing quite well.

10.     In reality, market share is influenced by Defendants' anticompetitive practices because Defendants flood U.S. markets with cheap, unsustainably sourced avocados,[5] boxing out

---

[4] Avocados From Mexico, *Our Company*, https://avocadosfrommexico.com/about/brand/ (last visited Jan. 28, 2026).

[5] "Cheap" refers not to sourcing costs alone, but the broader cheapening of the supply chain, from the cheapening of labor to the shifting of environmental costs from the corporations causing degradation to the local residents. *See generally*, Raj Patel and Jason W. Moore, *A History of the World in Seven Cheap Things*, Univ. of Cal. Press, (Jan. 23, 2026) https://smallpdfs.buddhistuniversity.net/patel-moore_2017_seven-cheap-things-introduction.pdf.

CLASS ACTION COMPLAINT

market participation and limiting choice, which harms competition.

11.     Due to Defendants' anticompetitive behavior, free competition between firms with products that differ in terms of origin and process of cultivation is diminished, and competition becomes a binary choice: forgo avocados, or buy avocados imported from Mexico.

12.     Plaintiffs have suffered declining sales, lost profits, loss of goodwill, and other injuries as a result of Defendants' unfair conduct.

13.     By inundating U.S. markets with their avocados and partnering with exporter and marketing entities, Defendants usurp market share and sales that otherwise would be open to broad competition.

14.     But for Defendants' anticompetitive conduct, free and fair competition would yield greater choice and variety in the avocado market; instead, the market is oversaturated with products form those few Mexican-avocado exporters such as Defendants.

15.     The class of California avocado farmers that Plaintiffs seek to represent would not have lost profits or market share as alleged herein, but for Defendants' anticompetitive conduct.[6]

16.     This violation of California law has injured and continues to injure Plaintiffs and the putative class.

17.     By this action, Plaintiffs seek to enjoin Defendants from engaging in unfair and anticompetitive practices.

## PARTIES

---

[6] This is a class action. Plaintiffs seek to represent California avocado growers. Defendants are the largest producers of Mexican avocados and are boxing out competition by flooding the market with their unsustainably grown Products. Plaintiffs have suffered loss of market share from these Defendants' business practices, as have all members of the proposed class.

4

CLASS ACTION COMPLAINT

A.    **Plaintiffs**

18.    Plaintiffs are California avocado growers engaged in the lawful cultivation and sale of avocados.

19.    Plaintiff Kachuck Enterprises is a California corporation with a principal place of business in Los Angeles County, California.

20.    Kachuck Enterprises manages, and its Kachuck Living Trust owns, a 372-acre avocado grove in Valley Center, California that was originally purchased by Dr. Norman Kachuck's family in 1968. Over the past 20 years, Kachuck Enterprises has harvested an average of 3 million pounds of California avocados annually.

21.    Kachuck Enterprises' avocado grove complies with all U.S. environmental laws and regulations and grows its avocados sustainably.

22.    Between 2007 and 2019, the average annual profit from Kachuck Enterprises' avocado grove was approximately $1.2 million. Since 2019, however, the business has suffered an average loss of approximately $900,000 per year. While fluctuations in the market played a role in the exact amount of profit or loss that Kachuck Enterprises attained in a given year, a portion of Kachuck Enterprises' losses are directly attributable to the Defendants' unfair conduct.

23.    During the applicable statute of limitations, Kachuck Enterprises has suffered declining sales, lost profits, loss of goodwill, and other injuries as a result, in part or in whole, of Defendants' unfair conduct.

24.    Bantle Avocado Farm is a domestic sole proprietorship owned by Jennifer and Kurt Bantle with a principal place of business in San Diego County, California.

5
CLASS ACTION COMPLAINT

25.     Bantle Avocado Farm operates a 12-acre avocado orchard in Fallbrook, California. The Bantles purchased the farm in 2011 as a means to help support their family.

26.     Bantle Avocado Farm complies with all U.S. environmental laws and regulations and grows its avocados sustainably.

27.     Since 2016 and the present, they have faced financial losses in the amount of at least $600,000. While fluctuations in the market played a role in the exact amount of profit or loss that Bantle Avocado Farm attained in a given year, a portion of Bantle Avocado Farm's losses are directly attributable to the Defendants' unfair conduct.

28.     During the applicable statute of limitations, Bantle Avocado Farm has suffered declining sales, lost profits, loss of goodwill, and other injuries as a result, in part or in whole, of Defendants' unfair conduct, including deceptive marketing of Mexican avocados.

29.     Maskell Family Trust d/b/a Maskell Growers ("Maskell Growers") is a living trust operated by Stuart Maskell with a principal place of business in San Diego County, California.

30.     Since 2019, Maskell Growers has operated a 6-acre avocado orchard in San Marcos, California.

31.     Maskell Growers complies with all U.S. environmental laws and regulations and grows its avocados sustainably.

32.     Since 2021, Maskell Growers has incurred approximately $30,000 to $60,000 in financial losses each year. While fluctuations in the market played a role in the exact amount of profit or loss that Maskell Growers attained in a given year, a portion of Maskell Growers' losses are directly attributable to the Defendants' unfair conduct.

CLASS ACTION COMPLAINT

33.     During the relevant time period, Maskell Growers has suffered declining sales, lost profits, loss of goodwill, and other injuries as a result, in part or in whole, of Defendants' unfair conduct, including deceptive marketing of Mexican avocados.

34.     Plaintiff Northern Capital, Inc. ("Northern Capital") is a California corporation with a principal place of business in San Diego County, California.

35.      Northern Capital owns and operates a 15-acre avocado farm located in Fallbrook, California. Northern Capital's chief executive officer has been involved in avocado farming since 1978.

36.     Northern Capital complies with all U.S. environmental laws and regulations and grows its avocados sustainably.

37.     For the time period between 2016 and 2023, Northern Capital has operated at a net loss for four out of the eight years, ranging from approximately $25,000 to $75,000 in losses for each of those years. While fluctuations in the market played a role in the exact amount of profit or loss that Northern Capital attained in a given year, a portion of Northern Capital's losses are directly attributable to the Defendants' unfair conduct.

38.     During the relevant time period, Northern Capital has suffered declining sales, lost profits, loss of goodwill, and other injuries as a result, in part or in whole, of Defendants' unfair conduct, including deceptive marketing of Mexican avocados.

**B.    Defendants**

39.     Defendants are importers and distributors of avocados that compete directly with Plaintiffs in the same relevant market.

40.     Defendant Mission is a Delaware corporation founded in 1983 and headquartered in Ventura County, California.

41.     Mission is a vertically integrated company and global supplier and seller of avocados and mangos.[7]

42.     Mission distributes and sells its avocados, or causes its avocados to be distributed and sold, throughout the United States, including in California.

43.     Mission is the self-described "#1 exporter of Mexican avocados to the U.S."[8] Mission specifically states that it has "long-standing relationships with avocado growers throughout Mexico's premium growing regions of Michoacán & Jalisco."[9]

44.     Mexican government shipping records show that Mission sources its avocados from orchards installed on deforested land in Michoacán and Jalisco. Upon information and belief, based on satellite imagery, these orchards exist on land that previously contained mature, native forest—established habitats removed for monocrop avocado cultivation.

45.     Defendant Calavo is a California business corporation founded in 1982 and headquartered in Murrieta, California.

46.     Calavo is one of the leading producers and distributors of avocados globally.

47.     Calavo is an avocado producer, packer, importer, and distributor with offices and distribution centers across the United States, and with sourcing operations in Mexico, Colombia, Peru, and Chile.

---

[7]     *Discover the Mission Advantage*, Mission Produce, https://missionproduce.com/discover-the-mission-advantage (last visited Jan. 28, 2026).

[8]*Mexico*, Mission Produce, https://missionproduce.com/mexico (last visited Jan. 28, 2026).

[9] *Id.*

8
CLASS ACTION COMPLAINT

48.     Calavo distributes and sells its avocados, or causes its avocados to be distributed and sold, throughout the United States, including in California.

49.     Mexican government shipping records show that Calavo sources its avocados from orchards installed on deforested land in Michoacán and Jalisco. Upon information and belief, based on satellite imagery, these orchards exist on land that previously contained mature, native forest—established habitats removed for monocrop avocado cultivation.

50.     Defendant Fresh Del Monte Produce Inc. is a foreign business incorporated in the Cayman Islands founded in 1989 and headquartered in Coral Gables, Florida.

51.     Defendant Del Monte Fresh Produce Company is a Delaware business corporation formed in 1985 and headquartered in Coral Gables, Florida.

52.     Defendant Del Monte Fresh Produce N.A. Inc. is a Florida business corporation formed in 1969 and headquartered in Coral Gables, Florida.

53.     Del Monte is a producer, packer, importer, and distributor of avocados and other food products with offices and distribution centers across the United States, and with sourcing operations across Central America, South America, Europe, Kenya, the Middle East, North Africa, Japan, South Korea, Hong Kong, and the Philippines.

54.     Del Monte distributes and sells its avocados, or causes its avocados to be distributed and sold, throughout the United States, including in California.

55.     Mexican government shipping records show that Del Monte sources its avocados from orchards installed on deforested land in Michoacán and Jalisco. Upon information and belief, based on satellite imagery, these orchards exist on land that previously contained mature, native forest—established habitats removed for monocrop avocado cultivation.

9

CLASS ACTION COMPLAINT

56.    Collectively, Defendants are the primary importers of avocados from Mexico to the U.S. and are thus able to influence the market for import of Mexican avocados to the U.S.

## IV.    JURISDICTION AND VENUE

57.    This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act ("CAFA"). There are at least 100 members in the proposed class. Plaintiffs are citizens of California and have principal places of business within the State of California. On information and belief, Mission is a citizen of the State of California; Calavo is a citizen of the State of California; and the Del Monte Defendants are citizens of the State of Florida.

58.    This Court has personal jurisdiction over Defendants in that they regularly conduct and transact business in California, purposefully avail themselves of the laws of California, market their avocados to consumers in California and sell their Products in numerous grocery stores in California.

59.    Venue is proper in this District under 28 U.S.C. § 1391. Substantial acts in furtherance of the alleged challenged commercial conduct, including the usurpation of market share by inundating U.S. markets with unsustainably sourced avocados, has effects within and/or occurred within this District.

60.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity).

## IV.    FACT ALLEGATIONS

61.    Plaintiffs and Defendants are horizontal competitors in the avocado market. Plaintiffs are required to internalize significant regulatory and compliance costs. Defendants engage in sourcing practices that externalize comparable costs, enabling the influx of artificially low-cost supply that distorts competitive conditions.

62.    The issue is not simply that avocados imported from Mexico may be produced at lower cost than California-grown avocados. Rather, Defendants engage in coordinated commercial and distribution efforts that result in flooding U.S. markets with large volumes of imported avocados. Defendants act in coordination with exporter associations and industry organizations to expand supply, increase market penetration, and capture market share. By leveraging their size and position within upstream supply and distribution channels, Defendants are able to externalize costs that domestic producers must bear and deploy pricing and volume strategies that undercut competition and distort competitive conditions, to the detriment of California avocado farmers, including Plaintiffs and the class they seek to represent.

### A. The Mexican Avocado Industrial Complex

63.    The Mexican Avocado industry has boomed in the last few decades. By externalizing compliance costs and flooding the market with low-cost supply, Defendants impair the ability of lawful competitors to compete on equal terms and threaten competition itself.

64.    To help feed this avocado boom, the Association of Avocado Exporting Producers and Packers (APEAM) and the Mexican Hass Avocado Importers Association (MHAIA) created Avocados from Mexico (AFM) to support the business operations of APEAM and MHAIA.[10]

65.    Avocados From Mexico is widely considered to be the primary catalyst for the popularity of Mexican Avocados due to their award-winning super bowl commercials and ear worm jingle "avocados from Mexico."[11]

66.    But Avocados from Mexico does not deal exclusively in promotion; AFM is also a prolific seller of avocados in its own right, making it a formidable competitor to Del Monte, Mission, and Calavo.[12]

67.    Calavo remits to its competitor AFM millions of dollars each year, through AFM's parent, APEAM.[13]

68.    Avocados From Mexico explains that its work is "Rooted In Collaboration" on its website.[14]

---

[10] Calavo Growers, Inc., SEC Form 10-K for fiscal year ended October 31, 2025, https://ir.calavo.com/static-files/08f783b5-17cb-44fc-b4ce-fe87d95e5bcf (last visited Jan. 24, 2026).

[11] Avocados From Mexico Landing Page, https://avocadosfrommexico.com/ (last visited Jan. 24, 2026); Tad Thompson, "How Avocados Conquered the Super Bowl," *Vision Magazine*, https://northamerica.visionmagazine.com/how-avocados-conquered-the-super-bowl/ (last visited Jan. 24, 2026).

[12] Avocados From Mexico, *Retail*, https://avocadosfrommexico.com/retail/ (last visited Jan. 24, 2026).

[13] Calavo Growers, Inc., SEC Form 10-K for fiscal year ended October 31, 2025, https://ir.calavo.com/static-files/08f783b5-17cb-44fc-b4ce-fe87d95e5bcf (last visited Jan. 24, 2026).

[14] Avocados From Mexico, *Our Company*, https://avocadosfrommexico.com/about/brand/ (last visited Jan. 24, 2026).

12

CLASS ACTION COMPLAINT

69.     Del Monte and Mission do not state any remittances to AFM in their 10-Ks, though Mission's statements about APEAM, MHAIA, and AFM appear to be copied and pasted directly from Calavo's.[15]

70.     It is the collaboration of these avocado giants that limits market participation by U.S. growers, like Plaintiffs.

71.     Large exporters working together with APEAM and MHAIA, and the non-profit marketing/sales entity AFM, creates unfair barriers for competitors who lack the multinational reach and leverage to team up and box out competition, while simultaneously shifting the cost of harmful environmental actions away from themselves and onto local residents of a foreign nation.

72.     Further limiting competition is corporate consolidation; Mission Produce is actively acquiring one of its largest competitors and co-defendant, Calavo Growers, in an estimated $430 million cash-and-stock transaction.[16]

73.     During a news conference about the acquisition, Mission's CEO John Pawlowski stated that the acquisition positions Mission well to "capture the increasing demand."[17]

74.     On top of the many exporter associations and a non-profit dedicated to supercharging the promotion and product placement of Defendants' brand, Mission is now acquiring one of its main rivals to further capture demand in an industry where 80% of avocados are imported from Mexico. Simply put, these Mexican avocado importing giants are kicking the

---

[15] Mission Produce, Inc., SEC Form 10-K for fiscal year ended October 31, 2025, https://investors.missionproduce.com/node/10066/html (last visited Jan. 24, 2026).

[16] Sarah Zimmerman, "Mission Produce buys avocado rival Calavo in deal worth $430M," *FoodDive*, https://www.fooddive.com/news/mission-produce-buys-calavo-avocados/809742/ (last visited Jan. 24, 2026).

[17] *Id.*

ladder away, impairing competition, and actively swallowing one another with the help of purported non-profit entities and associations.

75.     As Ken Melban, President of the California Avocado Commission, said in a Dec. 3, 2025, hearing, there is a real risk that "surging, low-priced imports will make [the California avocado] industry unsustainable."[18] This will not harm only competitors in the avocado industry; this will harm the marketplace and fair competition itself as there will be no competition, no optionality, and no counterbalancing price controls if a handful of Mexican avocado importers put all other avocado producers out of business by exploiting foreign nations.

**B. The Cheapening of Avocados – Defendants Shift the Cost of Environmental Destruction to Mexican Residents and Leverage that Exploitative Practice to Dominate the U.S. Market.**

**1.     Defendants Each Source Avocados from Orchards in Mexico Installed on Recently Deforested Land.**

76.     Mexican government shipping records, cross-referenced with Mexican government maps of avocado orchards certified to export to the United States and with satellite imagery, confirm that Defendants each sourced avocados from orchards installed on deforested land as recently as 2024, as explained in further detail below.

77.     Mexican law requires a federal permit to convert forests to agricultural uses. Government records indicate that no such permits have been issued in Michoacán for at least two decades; none were issued in Jalisco between 2011 and 2022; and just nine were issued in the state

---

[18] Testimony of Ken Melban, Hearing on the Operation of USMCA, Dec. 3-5, 2026, https://www.californiaavocadogrowers.com/sites/default/files/2025-12/USTR-USMCA-Comments-KMelban-Dec-2025.pdf (last visited Jan. 24, 2026).

CLASS ACTION COMPLAINT

for avocado plantations between 2000 and 2010.[19] In this regard, Defendants' avocado sourcing, in addition to being unsustainable, appears to be illegal.

78.    Forest clearing for avocado plantations has perpetuated deforestation of these important forests and threatened water supply across the state. A study published in the *Journal of Environmental Management* in 2020 indicated that avocado orchards accounted for about one-fifth of the deforestation in Michoacán and neighboring Jalisco between 2001 and 2017.[20]

### a.    Mission's Sourcing Practices.

79.    Satellite imagery of Zacapu, Michoacán shows before (February 2015) and after (February 2024) photos of land where avocado orchards currently exist. The images below illustrate how deforestation has impacted an orchard from which Mission sourced 27,510 kilograms of avocados in 2022 (area in blue).[21] Mission also purchased avocados from this orchard in January 2024.[22]

---

[19] Autorizaciones De Cambio De Uso Del Suelo En Terrenos Forestales 2003-2022 [Authorizations For Changes In Land Use On Forest Land 2003-2022], Secretaria De Medio Ambiente Y Recursos Naturales, Delegacion Federal En Michoacán [Sec'y of the Env't and Nat. Res., Fed. Delegation] https://www.gob.mx/tramites/ficha/solicitud-de-cambio-de-uso-de-suelo-en-terrenos-forestales/SEMARNAT237 (downloaded on May 1, 2024).

[20] Kimin Cho et al., *Where does your guacamole come from? Detecting deforestation associated with the export of avocados from Mexico to the United States*, 278 J. OF ENV'T MGMT. 111482 (Oct. 27, 2020) https://pubmed.ncbi.nlm.nih.gov/33126191/.

[21] Google Earth images. Data sourced from Mexican Government Transparency Request 330028323000032; publico.senasica.gob.mx/?id=7258. Mexican Government Shipping Records Reference Number HUE08161070708 (on file with Plaintiff's counsel).

[22] *Deforestation in Mexico*, Climate Rights Int'l (Aug. 6, 2024), https://cri.org/reports/us-avocado-sellers-fail-to-end-sourcing-from-illegally-deforested-land-in-mexico/.

15

CLASS ACTION COMPLAINT





80.     Additionally, satellite imagery cross-referenced with shipping records show that in 2022, Mission sourced 17,330 kilograms of avocados from an orchard in Madero, Michoacán

installed on deforested land.[23] Mission also purchased avocados from the same orchard in December 2023.[24]

81.    Mexican government shipping records indicate that in 2022, Mission sourced 16,290 kilograms from another Madero orchard, which satellite imagery confirms was installed on land deforested between 2015 and 2024.[25]

82.    In 2022, Mission sourced a total of 7,700 kilograms of avocados from two Ziracuaretiro orchards that were installed on deforested land between 2015 and 2023.[26]

83.    These sourcing practices, joined together with the cooperation among the biggest exporters with MHAIA, APEAM, and AFM, create an arsenal of anticompetitive business practices that impair competition by inundating U.S. markets with cheaply sourced avocados.

### b.    Calavo's Sourcing Practices

84.    Based upon Mexican government shipping records, in 2022, Calavo sourced more than 700,000 kilograms of avocados (more than 7 million avocados) from the nine orchards shaded in blue in the image below, each of which was installed on deforested land, as confirmed by satellite imagery.[27]

---

[23] Mexican Government Shipping Records Reference Number HUE08160490979 (on file with Plaintiff's counsel).

[24] *Deforestation in Mexico, supra* note 22.

[25] Mexican Government Shipping Records Reference Number HUE08160490325 (on file with Plaintiff's counsel).

[26] Mexican Government Shipping Records Reference Numbers HUE08160870679 and HUE08160795278 (on file with Plaintiff's counsel).

[27] Records of "harvest logs" ("bitacoras de cosecha") provided via Mexico's transparency law response from National Service of Health, Food Safety and Quality (SENASICA) to request number 330028323000180, June 27, 2023. The referenced numbers are taken from Mexican Government Shipping records (on file with Plaintiffs' counsel) with the following reference numbers, followed by the weights of shipments for each avocado orchard:  HUE08160826643: 75,685; HUE08160825241: 425,371; HUE08160826641: 30,850; HUE08160825240: 62,890; HUE08160823052:    9,990;    HUE08160826640:    26,180;    HUE08160825239:    57,580; HUE08160826642: 15,415; HUE08160826621: 12,755.

17

CLASS ACTION COMPLAINT

85.    The first image below from 2011 reveals nine orchards in the municipality of
Tacámbaro, Michoacan covered in native forest, while the next image shows the same area in
2023, now deforested and replaced with avocado orchards.



86.     Mexican government shipping records indicate that in 2022, Calavo sourced 29,460 kilograms of avocados from orchards in the municipality of Apatzingán that were installed on land that was deforested between 2013 and 2023.[28]

87.     Mexican government shipping records also reveal that Calavo sourced 24,665 kilograms of avocados from orchards in the municipality of Morelia, Michoacan that were installed on land that was deforested between 2011 and 2023.

88.     In December 2023, Calavo purchased at least 22,165 kilograms of avocados from an orchard installed on land that was deforested between 2015 and 2023.[29]

---

[28] HUE08160837637 supplied 29,460 kilograms of avocados to Calavo according to government shipment records (on file with Plaintiffs' counsel).
[29] Mexican Government Shipping Records Reference Number HUE08161070410 (on file with Plaintiffs' counsel).

19

CLASS ACTION COMPLAINT

89.    In 2023, Calavo purchased at least 15,385 kilograms of avocados from an orchard installed on land that was deforested between 2015 and 2024.[30]

90.    In 2023 and 2024, Calavo purchased at least 15,795 kilograms of avocados from an orchard in Madero, Michoacán installed on land that was deforested between 2015 and 2023.[31]

91.    These sourcing practices, joined together with the cooperation among the biggest exporters with MHAIA, APEAM, and AFM, create an arsenal of anticompetitive business practices that impair competition by inundating U.S. markets with cheaply sourced avocados.

### c.    Del Monte's Sourcing Practices.

92.    Based upon Mexican government shipping records, in 2022, Del Monte sourced 107,764 kilograms of avocados (more than half a million avocados) from the deforested land outlined in green—the lines comport with Mexican government maps of orchards certified to exports to the United States—in the Google Earth images below.[32]

93.    Based upon Mexican government shipping records, in 2022, Del Monte sourced 49,394 kilograms from orchards in the municipality of Zacapu, Michoacán, shown in the images below.[33] Satellite photography from May 2012 shows native forest covering this land; photography

---

[30] Mexican Government Shipping Records Reference Number HUE08160794632 (on file with Plaintiffs' counsel).

[31] Mexican Government Shipping Records Reference Number HUE08160490979 (on file with Plaintiffs' counsel).

[32] Mexican Government Shipping Records reference numbers: HUE08160490766, HUE08161070041, HUE08160530568, HUE08160530573, HUE08160530574, HUE08161070741, HUE08161070500, HUE08161070501, HUE08161070695, HUE08161070694, HUE08160870435, and HUE0816083511 (on file with Plaintiffs' counsel).

[33] Mexican Government Shipping Records reference numbers HUE08161070695 and HUE08161070694 (on file with Plaintiffs' counsel).

CLASS ACTION COMPLAINT

from October 2020 shows the land deforested and replaced with an avocado orchard from which Del Monte sourced avocados:





94.     Mexican shipping records[34] and satellite imagery reveal that, in 2022, Del Monte

sourced 15,125 kilograms of avocados from an orchard in the municipality of Taretan, Michoacán

that was installed on land deforested between 2011 and 2023.

95.     Mexican shipping records[35] reveal that, in 2022, Del Monte sourced 12,984

kilograms from the orchards in the municipality of Zacapu, Michoacán that were installed on land

deforested between 2012 and 2022.

---

[34] Mexican Government Shipping Record Reference Number HUE08160870435 (on file
with Plaintiffs' counsel).
[35] Mexican Government Shipping Records Reference Numbers HUE08161070500 and
HUE08161070501 (on file with Plaintiffs' counsel).

96.     In September 2023, Del Monte sourced at least 14,480 kilograms of avocados from an orchard that was installed on land deforested between 2013 and 2023.[36]

97.     In December 2023 and February 2024, Del Monte sourced at least 21,175 kilograms of avocados from an orchard that was installed on land deforested between 2015 and 2023.[37]

98.     From March through April 2024, Del Monte sourced at least 56,460 avocados from an orchard that was installed on land deforested between 2015 and 2023.[38]

99.     As reported by Reuters, in November of 2023, Del Monte was confronted and informed about deforestation in its supply chain.[39]

100.     These sourcing practices, joined together with the cooperation among the biggest exporters with MHAIA, APEAM, and AFM, create an arsenal of anticompetitive business practices that impair competition by inundating U.S. markets with cheaply sourced avocados.

### 2. Defendants' Exploitative Sourcing Practices Exacerbate Water Scarcity.

101.     Water depletion is endemic within the Mexican avocado industry, which uses 9.5 billion liters of water daily for production.[40]

---

[36] Mexican Government Shipping Records Reference Number HUE08160010356 (on file with Plaintiffs' counsel).

[37] Mexican Government Shipping Records Reference Number HUE08160826463 (on file with Plaintiffs' counsel).

[38] Mexican Government Shipping Records Reference Number HUE08161070336 (on file with Plaintiffs' counsel).

[39] Cassandra Garrison, Avocado goldrush links US companies with Mexico's deforestation disaster, REUTERS (Aug. 6, 2024), https://www.reuters.com/investigations/avocado-goldrush-links-us-companies-with-mexicos-deforestation-disaster-2024-08-06/.

[40] M.M. Mekonnen & A.Y. Hoekstra, *The Green, Blue and Grey Water Footprint of Crops and Derived Crop Products* (Volume 1: Main Report), UNESCO-IHE Inst. For Water Educ. at 20 (Dec. 2010) https://waterfootprint.org/resources/Report47-WaterFootprintCrops-Vol1.pdf.

102.    Mexico already experiences high levels of water scarcity due to its natural climate,

industry use, water-management practices, and other contributing factors.[41] The avocado industry

exacerbates this existing water scarcity crisis and jeopardizes the use of the limited water available

for local populations.

103.    Virtually all of the avocado-producing areas of Michoacán, and most of the areas

in Jalisco, overlap with watersheds or aquifers that the Mexican government has determined to

have a "deficit" of water available, meaning that additional water extraction cannot be sustained.

104.    Upon information and belief, Defendants each source avocados from orchards in

areas that the Mexican government has determined to have a deficit of water available.

105.    A recent study revealed that agro-industrial avocado production consumes up to

120% of the surface and groundwater volumes granted to agriculture use in years with dry

conditions in Michoacán, which is "creating water stress and scarcity, and leading to water rights

conflicts and social discomfort" for communities across the region.[42]

106.    Defendants' sourcing of avocados from avocado orchards installed on deforested

land directly links Defendants' sourcing practices with increased water scarcity in the avocado-

growing regions of Mexico. This is because native forests play a crucial role in allowing water to

infiltrate the soil to replenish aquifers. While native forests "naturally act to retain water in the

---

[41] Cody Copeland, *Mexico water crisis in spotlight on World Water Day*, Courthouse
News Service (Mar. 22, 2023), https://www.courthousenews.com/mexico-water-crisis-in-the-
spotlight-on-world-water-day/.
[42] Alberto F. Gómez-Tagle et al., *Blue and green water footprint of agro-industrial
avocado production in Central Mexico*, 14 Sustainability 9664 (Aug. 5, 2022),
https://doi.org/10.3390/su14159664.

24
<span style="font-variant:small-caps">Class Action Complaint</span>

soil," agricultural monocultures such as avocado production "usually result in lower soil water retention and increased runoff."[43]

107.   Researchers have found that pine trees native to avocado-growing regions of Mexico naturally filter water into the ground at least fourteen times more effectively than avocado trees. This is because branch pruning alters the way water moves down avocado trees, avocado trees are spaced further apart in orchards than native plants in a forest, and avocado tree roots tend to grow more horizontally than pine roots.[44]

108.   The *New York Times* recently reported that "clear-cutting for avocados, which require vast amounts of water, has ignited another crisis [for communities in the avocado-growing region of Mexico] by draining aquifers that are a lifeline for many farmers."[45]

109.   A vast majority of the avocados that are exported to the U.S. are grown in either Michoacán or Jalisco.[46]

110.   As these facts suggest, not only are Defendants sourcing one of the most water-intensive crops from an already water-deficient region, but they are actively contributing to increased water scarcity by sourcing avocados from orchards installed on deforested land, and they

---

[43] M. Bravo-Espinosa et al., *Effects of Converting Forest to Avocado Orchards on Topsoil Properties in the Trans-Mexican Volcanic System, Mexico*, 25 Land Degradation & Dev. 467 (May 16, 2012), https://doi.org/10.1002/ldr.2163.

[44] Alberto Gómez-Tagle et al., *supra* note 42.

[45] Simon Romero & Emiliano Rodriguez Mega, *Americans Love Avocados. It's Killing Mexico's Forests*, The New York Times (Nov. 28, 2023), https://www.nytimes.com/2023/11/28/us/mexico-avocado-deforestation.html.

[46] *Avocado Annual*, U.S. Dept. of Agriculture Foreign Agricultural Service (Apr. 5, 2024) https://apps.fas.usda.gov/newgainapi/api/Report/DownloadReportByFileName?fileName=Avocado%20Annual_Mexico%20City_Mexico_MX2024-0018.pdf.

CLASS ACTION COMPLAINT

do not pay for any of the consequences associated with their water overuse, enabling the flood of
Mexican avocados into U.S. markets.

111.    These sourcing practices, joined together with the cooperation among the biggest
exporters with MHAIA, APEAM, and AFM, create an arsenal of anticompetitive business
practices that impair competition by inundating U.S. markets with cheaply sourced avocados.

### 3. Defendants Operate on Parallel Tracks, Exploit Mexican Citizens, Ecosystems, and Water tables, and Use Cost Savings from Those Practices to Overwhelm the U.S. Avocado Market.

112.    When big exporters like Mission, Calavo, and Del Monte rely on decimated forests,
tap into overburdened water resources indigenous people need, and engage in low-monetary cost
but high-ecological cost activities like monocultural farming, they do not pay for any of the
requisite harms. Rather, they profit off their exploitation by cutting supply costs and using the
extra to remit millions of dollars to marketing entities like AFM, acquire each other, or increase
infrastructures to other countries to rinse and repeat the cycle.

113.    This activity, referred to as "externalizing costs,"[47] is more accurately called cost-
shifting; Mission, Del Monte, and Calavo shift the costs of their disastrous business practices onto
the residents of Mexico, citizens of the worldwide ecological system, and market competitors who
take the hit that would otherwise have been borne by the large importers had they not been shifted
away.

---

[47] Thomas Helbling, "Externalities: Prices Do Not Capture All Costs," International
Monetary Fund, https://www.imf.org/external/pubs/ft/fandd/basics/38-externalities.htm (last
visited Jan. 24, 2026).

CLASS ACTION COMPLAINT

114.    It is well-established dogma in mainstream economics that businesses must grow at any cost. Growth comes from increased production, increased prices, or, when all else fails, decreased competition.

115.    It is also well-established that the Earth has certain biophysical limits, no matter how hard economists shut their eyes. There are only so many avocados that can be produced in the world, even when sustainable land and water constraints are exceeded. The next logical step, as Mission Produce is well aware, is market control, i.e., limiting competition. Mission's pending acquisition of Calavo Growers, Inc. is the exact logical endpoint of these avocado giants that Plaintiffs find so troubling. By controlling market participation, both through acquisition and through an insurmountable influx of cheaply-sourced avocados, Defendants are harming competition in the avocado market. No longer do consumers have a choice between Californian-grown and Mexican-grown, or sustainably-grown and unsustainably-grown; rather, consumers get to "choose" between Mission-, Calavo-, Del Monte-, or Avocados from Mexico-branded avocados, none of which offer truly distinguishable characteristics thanks to the collaboration between these large exporters as described above.

## V. Class Allegations

116.    Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

117.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(b)(2) only.

118.    Plaintiffs bring this action on behalf of themselves and all other similarly situated

businesses and individual competitors within California (the "Class") defined as follows:

> all individuals and business entities engaged in the business of
> producing, or causing to be produced, California-grown avocados
> for sale within the State of California within the applicable statute
> of limitations, and until the date of class certification (the "Class
> Period").

119.    Excluded from the Class are any persons or business entities with an

average annual production of less than 10,000 pounds of avocados in each of the three preceding

market years, Defendants, and their respective parents, subsidiaries and affiliates, legal

representatives, officers, directors, assigns, and successors, as well as any government entities

including the Court and its staff.

120.    Plaintiffs reserve the right to amend the class definition prior to class certification.

121.    There are substantial questions of law and fact common to all members of the

Class, which will predominate over any individual issues. These common questions of law and

fact include, without limitation:

(a)    whether Defendants' business practices are unfair, anticompetitive, or

tend to restrict or limit market participation in violation of California law;

(b)    whether Defendants' conduct as set forth above injured, and may

continue to injure, Plaintiffs and Class members.

122.    Plaintiffs' claims are typical of the claims of the Class. Plaintiffs are each

members of a well-defined class of similarly situated persons and/or entities, and the members

of the Class were and are similarly affected by Defendants' conduct and are owed the same kinds

of relief, as alleged in this Complaint. Members of the Class are ascertainable from Plaintiffs'

description of the Class, and from records of third parties accessible through discovery.

123.    Plaintiffs will fairly and adequately protect the interests of the Class and have no

interests that are antagonistic to the claims of the Class. Plaintiffs will vigorously pursue the

CLASS ACTION COMPLAINT

claims of the Class.

124.    Plaintiffs have retained counsel who are competent and experienced in class actions relating to unfair business practices. Plaintiffs' counsel have successfully represented plaintiffs in complex class actions and currently represent plaintiffs in complex class action lawsuits. Plaintiffs' counsel have experience in the representation of business competitors harmed by unfair competition.

125.    A class action provides a fair and efficient method, if not the only method, for adjudicating this controversy. The substantive claims of Plaintiffs and the Class are nearly identical and will require evidentiary proof of the same kind and application of the same laws. There is no plain, speedy, or adequate remedy other than by maintenance of this class action.

126.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because Class members number in the hundreds or thousands and individual joinder is impracticable. The disposition of this case as part of a single class action will benefit the parties and reduce the aggregate judicial resources that would be spent if this matter were handled as hundreds or thousands of separate lawsuits, due to, for example, the efficiency of joint discovery. Trial of Plaintiffs' and the Class members' claims together is manageable.

127.    No member of the Class has a substantial interest in individually controlling the prosecution of a separate action.

128.    Defendants have acted on grounds generally applicable to the Class, making final injunctive relief appropriate with respect to the Class as a whole.

129.    The prosecution of separate actions by members of the Class would create a risk

of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. Additionally, individual actions could be dispositive of the interests of the Class even where certain Class members are not parties to such actions.

130.    Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance of a class action.

## VI. Cause of Action

### CAUSES OF ACTION

### COUNT I
**Violation of California's Unfair Competition Law**
**(Against All Defendants)**

### Cal. Bus. & Prof. Code § 17200

131.    Plaintiffs incorporate by reference and reallege herein all paragraphs alleged above.

132.    Plaintiffs and Defendants are horizontal competitors. Plaintiffs comply with strict environmental and food-safety requirements. Defendants engage in commercial practices that shift comparable costs onto foreign communities and distort competitive conditions. This claim is governed by *Cel-Tech* and Plaintiffs seek forward-looking equitable relief only.

133.    Defendants' conduct is "unfair" because it violates the policy and spirit of the antitrust laws, threatens incipient antitrust violations, and harms competition itself. Defendants source avocados from illegally deforested land, coordinate with exporter associations to expand supply and flood the U.S. market with artificially low-cost imports and use vertically integrated supply chains and consolidation to control sourcing, distribution, and market access. These

practices depress prices, reduce consumer choice, displace domestic producers, and threaten the viability of the California avocado industry.

134.    Defendants' conduct constitutes an unfair business practice because it is tethered to legislatively declared policies favoring fair competition and threatens incipient antitrust violations by distorting cost structures, enabling artificial market flooding, and foreclosing lawful competitors.

135.    Plaintiffs seek declaratory and injunctive relief prohibiting Defendants from continuing these unfair practices and any other equitable relief the Court finds appropriate.

136.    Defendants' sourcing practices contribute to deforestation, exacerbate water scarcity, and, joined together with biggest exporters cooperation with MHAIA, APEAM, and AFM, create an arsenal of anticompetitive business practices that impair competition by inundating U.S. markets with cheaply sourced avocados.

137.    By committing the acts and practices alleged herein, Defendants have violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, as to the Class as a whole, by engaging in unfair conduct.

138.    The UCL is extremely broad in scope, borrowing from any other statute, but also exceeding the scope of underlying statutory violations.[48] It has as its major purpose "the preservation of fair business competition."[49] Business conduct can be deemed unfair if it is

---

[48] *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 180 (Cal. 1999).
[49] *Id.* (quoting *Barquis v. Merchants Collection Assn.*, 7 Cal.3d 94, 110 (Cal. 1972)).

CLASS ACTION COMPLAINT

unlawful, but unfairness claims can succeed independent of proving an underlying statutory violation.[50]

139.     As this Court noted in its Jan. 22, 2026 Order, unfair conduct is defined using the "tethering test."[51] This test requires a finding of unfairness to be "tethered to some legislatively declared policy *or* proof of some actual or threatened impact on competition."[52] Unfairness is further defined in three ways: 1) "conduct that threatens an incipient violation of an antitrust law," 2) conduct that "violates the policy or spirit of one of those laws," or 3) conduct that "otherwise significantly threatens or harms competition."[53]

140.     Defendants' conduct fosters an anticompetitive atmosphere in which market participants and competition are both stifled by the influx of low-cost supply, only available to the largest holders of market share. This directly contravenes the UCL's purpose, which is to "safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition," and is to be "liberally construed that its beneficial purposes may be subserved."[54] Defendants' collaboration and pooling of resources[55] and exploitation of a foreign

---

[50] *Cel-Tech*, 20 Cal.4th at 180-81 (citing *Podolsky v. First Healthcare Corp.*, 50 Cal.App.4th 632, 647 (Cal. Ct. App. 1996)). The *Cel-Tech* court describes the *Motors, Inc. v. Times Mirror Co.* case in which plaintiff's unfair UCL claim succeeded even though the conduct was not prohibited under the underlying statute. 102 Cal.App.3d 735, 741 (Cal. Ct. App. 1980).
[51] Jan. 22, 2026 Order, ECF 63; *Cel-Tech*, 20 Cal. 4th at 186-87.
[52] *Id.* (emphasis added).
[53] *Id.*
[54] Cal. Bus. & Prof. Code §§ 17001-17002.
[55] Whether through APEAM, MHAIA, or AFM, collaborating on expanding supply and promoting avocados specifically from Mexico, without paying for the environmental costs of Defendants' disastrous sourcing practices, severely limits fair competition for U.S. producers and denies consumers the option of choosing avocados outside of those few multinational exporters that have not, as of this filing, merged.

nation[56] undercuts fair competition and limits the public's access to products other than Defendants'.

141.    Conduct that violates "the policy or spirit of the antitrust acts," includes practices that facilitate tacit coordination. Tacit coordination is an unfair business practice because it enables firms to team up and dominate markets, harming competition. Tacit coordination is most likely where the market is highly concentrated (dominated by a few companies with large market shares), products are homogenous, it is easy for each participant to monitor the terms on which other participants are dealing with purchasers, there are barriers to new market entry, participants are symmetrical (e.g., similar levels of vertical integration), capacity constraints, among other factors. Those conditions are present here: the avocado market is highly concentrated in the hands of a few competitors (eight in ten avocados come from Mexico, where Defendants dominate the market); Defendants can monitor one another, and even collaborate through MHAIA, APEAM, and AFM; entering the avocado industry requires access to, if not ownership of, farmland that can cultivate the fruit, as well as access to the distribution channels each Defendant dominates; each of the Defendants is vertically integrated; capacity is constrained to earth's biophysical limits, which Defendants exceed through monoculture and water use, and that capacity is even more constrained for Plaintiffs and the class they seek to represent, who are limited to California, by California law, and by California geographical constraints.

---

[56] Through mass deforestation, water theft, and non-permitted land uses, as described above, Defendants enjoy the benefits of an incredibly deep supply of Mexican avocados without paying the costs associated with environmental destruction that most market participants are forced to internalize.

142.    Defendants' conduct violates the Sherman and Cartwright Acts. The typical test applied to unfair conduct under the antitrust laws is the "rule of reason."[57] Under this test, a court will ask whether the challenged conduct promotes or suppresses competition.[58] Some courts also apply the "quick look rule of reason," which is applicable in cases where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets."[59] Defendants are multinational produce exporters with the largest market share. Defendants work with exporter associations and a marketing nonprofit to great effect—80% of all avocados in the U.S. market are exported from Mexico, and this figure is expected to rise. Making matters worse, Mission is acquiring Calavo, intent on expanding their avocado position in North America and putting themselves in a prime position to "capture" future demand. These immense produce exporters collaborate with multiple other organizations to source avocados in exploitative ways in foreign countries where the costs of business are often borne by the powerless. Defendants then flood U.S. markets with these avocados, suffocating competition and swallowing more market share for themselves. The industry is entirely unsustainable for any avocado seller not within Defendants' scheme.

143.    Mission's acquisition of Calavo highlights the anticompetitive practices alleged herein; Mission swallows distribution competitors, captures market share, and discourages competition.

---

[57] *In Re Cipro Cases I & II*, 61 Cal.4th 116, 146 (Cal. 2015).
[58] *Id.* (citing *Fisher v. City of Berkeley*, 37 Cal.3d 644, 672 (Cal. 1984)).
[59] *In Re Cipro Cases I & II*, 61 Cal.4th at 146-47 (quoting *California Dental Assn. v. F.T.C.*, 526 U.S. 756, 770 (1999)). Under this test, the defendant is tasked with providing procompetitive justifications for the challenged conduct.

34

CLASS ACTION COMPLAINT

144.    Plaintiffs also allege unfair conduct that is tethered to proof of some actual or threatened impact on competition, alleged in parallel to legislatively declared policies. As this Court stated in its January 22 Order, and the *Cel-Tech* court stated in its opinion, unfair conduct must be tethered to legislatively declared policy or proof of impact on competition.

145.    Defendants' conduct has decreased competition overall as Defendants command an increasing market share and control of distribution channels. Ken Melban, President of the California Avocado Commission, expressed his concern at a hearing in December about the risk that "surging, low-priced imports will make [the California avocado] industry unsustainable."[60] Each Plaintiff has incurred significant losses due to the influx of cheaply sourced avocados. As Mission finalizes procedures to acquire Calavo, the harm on competition is clear and direct; there is no longer a choice between Mexican and Californian avocados, or avocados grown under strict standards; rather, customers get only Mexican avocados from one of three major corporations (soon to be two) and the "marketing" entity they fund.

146.    Business and Professions Code section 17204 confers standing to private plaintiffs to sue under the Unfair Competition Law when they have suffered injury in fact and have lost money or property as a result of the unfair competition.

147.    By exploiting Mexican avocado farms and flooding the market with cheaply sourced Products, Defendants box out competitors and disallow options of any products bv other than Defendants' own products. This unfair competition in violation of the UCL will continue unless enjoined by this Court.

---

[60] Testimony of Ken Melban, Hearing on the Operation of USMCA, Dec. 3-5, 2026, https://www.californiaavocadogrowers.com/sites/default/files/2025-12/USTR-USMCA-Comments-KMelban-Dec-2025.pdf (last visited Jan. 24, 2026).

CLASS ACTION COMPLAINT

148.    Plaintiffs and the other members of the Class suffered injury in the form of declining sales, lost profits, loss of goodwill and other injuries as a result of Defendants' unlawful conduct.

149.    There is no benefit to consumers or competition from a flood of avocados that wipe out competition; consumers would have to purchase the Defendants' products or nothing if these practices continue, destroying competition.

150.    The consequences of Defendants' conduct as described above outweigh any justification, motive, or reason therefore, particularly considering the available legal alternatives that exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, and is substantially injurious to Plaintiffs and the other members of the Class.

151.    Pursuant to California Business and Professional Code § 17203, Plaintiffs and the members of the Class seek an order of this Court that, *inter alia*, requires Defendants to:

(a) cease their unfair acts; and

(b) pay costs of Plaintiffs and the Class.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and in favor of the Class as follows:

A.    An order certifying the proposed Class; appointing Plaintiffs as representatives of the Class; and appointing Plaintiffs' undersigned counsel as class counsel for the Class;

B.    A declaration that Defendants are financially responsible for notifying Class members of the pendency of this suit;

C.    Plaintiffs respectfully request that the Court enter an order granting the injunctive relief described above and such other equitable relief as the Court deems proper;

D.    An order awarding Plaintiffs and the other Class members the reasonable costs and expenses of suit.

## JURY TRIAL DEMANDED

Plaintiffs hereby demands a trial by jury.

DATED: January 28, 2026

RICHMAN LAW & POLICY


_____/s/ Kim Richman_____

Kim Richman (*Pro Hac Vice*)
Jaimie Mak (State Bar No. 236505)
535 Mission Street
San Francisco, CA 94105
Telephone: (415) 259-5688
krichman@richmanlawpolicy.com
jmak@richmanlawgroup.com

*Attorneys for Plaintiffs and Proposed Class*